# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

RALPH W. TALMAGE, AS TRUSTEE
OF RALPH W. TALMAGE TRUST, *et al.*,

      Plaintiffs,

                                **Case No. 2:17-cv-544**

    v.                            **JUDGE GEORGE C. SMITH**

                                     **Magistrate Judge Deavers**

JACQUELINE M. BRADLEY, *et al.*,

      Defendants.

## OPINION AND ORDER

Plaintiffs the Talmage and Haid Trusts initiated this lawsuit seeking a declaratory judgment to quiet title, asserting that their overriding royalty assignment is not subject to the 1994 Bradley Assignment, as well as a number of other claims. Defendants Jacqueline Bradley and the Estate of Ralph Bradley filed a Counterclaim against Plaintiffs and a Third-Party Complaint against Northwood Energy Corporation seeking to enforce the 1994 Bradley Assignment. This matter is now before the Court on Plaintiffs/Counterclaim Defendants' Motion for Partial Summary Judgment (Doc. 49) and Defendants/Third Party Plaintiffs' Motion for Partial Summary Judgment (Doc. 48). The Cross-Motions are fully briefed and ripe for review.[1] For the reasons that follow, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** and Defendants/Cross-Claimants Motion for Partial Summary Judgment is **GRANTED in part and DENIED in part**.

---

[1] Defendant Antero Resources Corporation ("Antero") filed a response stating that it does not take a position on which parties should receive the overriding royalty interest. Antero requests the Court enter judgment specifying the party(s) entitled to the overriding royalty interest and how much. (Doc. 53).

# I.    BACKGROUND

In April 1994, TransAtlantic Energy Corp., TransAtlantic Management Company, and TransAtlantic Gas Marketing, Inc. (collectively, "TransAtlantic") assigned and conveyed various oil and gas leases, in whole or in part, and related oil and gas wells, to Eastern States Oil & Gas, Inc. ("Eastern") (the "TransAtlantic-Eastern Assignment"). (Doc. 33 at ¶ 10-11; Doc. 33-1; Doc. 35 at ¶ 10; Doc. 48-2, Deposition of Ralph Talmage ("Talmage Dep.") at 262−64; Doc. 48-3, Deposition of John DiFrangia ("DiFrangia Dep.") at 71–73 & Ex. 6).   The TransAtlantic-Eastern Assignment concerned over 11,000 acres and 100 wells, including oil and gas leases located in Belmont, Monroe, and Noble Counties in Ohio that are specifically identified within Exhibit B to the TransAtlantic-Eastern Assignment (collectively referred to as the "Leases").   (Doc. 33-1 at Ex. B).   The TransAtlantic-Eastern Assignment was recorded in Belmont, Monroe, and Noble Counties in Ohio.   (Doc. 33, ¶¶ 13–15; Doc. 35, ¶¶ 13–15; Doc. 48-2 at 262–64).   All of the Leases were described in one exhibit, meaning that leases covering properties in Belmont, Monroe, and Noble Counties were conveyed by one instrument.   (Doc. 33-1; Doc. 33-2; Doc. 33-3; Ex. C).

TransAtlantic conveyed, generally, the following interests to Eastern: (1) 100% ownership of developed lease acreage within the Well Sites, and (2) 50% ownership of undeveloped lease acreage located outside of the Well Sites (subject to the retention of the Retained Wells and Retained Well Sites).   (Doc. 33-1).

Shortly after it acquired the Leases, Eastern conveyed to Ralph L. Bradley, who was then an Eastern executive, a five percent (5%) overriding royalty interest in all of the Leases.   (Doc.

33-4).[2]    The Bradley overriding royalty interest (the "Bradley Override") was granted in an

assignment (the "Bradley Assignment") which states in pertinent part as follows:

> **WHEREAS**, Eastern States Oil & Gas, Inc., a Virginia corporation ("Assignor"), acquired certain oil and gas properties, including certain oil and gas wells and certain oil and gas leases, pursuant to an Assignment and Bill of Sale dated April 21, 1994 and recorded in Volume 5, Page 947 of the Lease Records of Monroe County, Ohio, and Volume 108, Page 278 of the Lease Records of Belmont County, Ohio, collectively called the "Assignment").   The oil and gas wells existing as of the date of the Assignment are more particularly described in Exhibit A-1 of the Assignment (the "Wells"), and the oil and gas leases are more particularly described on Exhibit B of the Assignment (the "Leases"), which documents are incorporated herein by reference;

> **WHEREAS**, Assignor desires to assign an overriding royalty interests to Ralph L. Bradley, subject to the terms and conditions set out hereinafter.

> **NOW, THEREFORE**, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, EASTERN STATES OIL & GAS, INC., a Virginia corporation, hereby does GRANT, BARGAIN, SELL, ASSIGN, TRANSFER AND CONVEY, subject to all of the provisions set out hereinafter, without warranty of title, either express or implied, unto RALPH L. BRADLEY ("Assignee") ***an overriding royalty interest of five percent (5%) of 8/8ths*** (the "ORRI") in and to all of the acreage subject [to] the Leases and ***in and to all oil and gas produced from, or allocated to, said Leases***, . . .

(Doc. 33-4 (emphasis added)).    This assignment was made with the following exceptions:

1.        It is expressly understood that all of the producing Wells conveyed by the

---

[2]  An overriding royalty interest is an "interest in the oil and gas lease out of which it is carved, and cannot be a property interest of greater dignity than the lease itself."  (*Antolak v. Solid Rock Energy, Inc.*, 2012 U.S. Dist. LEXIS 158204, * 9–10 (S.D. Ohio 2012) (Watson, J.) (citing *XAE Corp. v. SMR Property Management Co.*, 1988 OK 51, 968 P.2d 1201, 1206 (Okla. 1998)).   Additionally, the Tenth Circuit Court of Appeals in *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882, rev'd., 375 U.S. 160, 11 L. Ed. 2d 261, 84 S. Ct. 273, reh'g denied, 375 U.S. 989, 11 L. Ed. 2d 476, 84 S. Ct. 515 (1964), defined an overriding royalty interest as "a fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor, free of any expense for exploration, drilling, development, operating, marketing and other costs incident to the production and sale of oil and gas produced from the lease.   It is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, as distinguished from the owner's reserved royalty interest.   It is generally held that an overriding royalty is an interest in real property."

Assignment – which is all of the Wells save and except the non-producing Baker #2 Well, Well ID WOM 12356 – are expressly excepted from this assignment of ORRI, it being the intention of the parties hereto that the ORRI provided for herein shall NOT apply to the producing wells acquired by Assignor under the Assignment, but shall apply to non-producing wells and future wells, subject to paragraph 2 below.

2.      The ORRI shall NOT apply to the first well drilled by Assignor offsetting each of the producing Wells.   By "offsetting", it is meant a well which is drilled to the same geologic formation as the subject Well.

3.      In the event Assignor exercises the pooling rights (if any) contained in the Leases, the ORRI assigned herein shall be unitized and paid on a unitized basis.

4.      In the event the leasehold estate of any of the Leases is less than 100%, the ORRI shall be proportionately reduced.   In addition, in the event the working interest in the Leases assigned to the Assignor by virtue of the Assignment is less than 100%, the ORRI shall be proportionately reduced.    It is expressly understood, however that any future assignment of working interest(s) by Assignor shall be made subject to the ORRI.

(Doc. 33-4).

The Bradley Assignment was recorded in Monroe County on December 28, 1994, and in Belmont Count on January 6, 1995.   However, it was not recorded in Noble County.   (*See* Doc. 33).   In fact, in the body of the Bradley Assignment, there is no mention of Noble County. However, Ms. Bordelon, who was employed as an attorney with Eastern at the time the Assignment was made, stated that "it was a clerical error"; "I know of no reason we would not have assigned the override to Ralph in Noble County"; "[w]e assigned an override to Ralph on everything.    And it appears to me that this was a mistake in not citing Noble.    It should have.    Why it was not, I don't remember.    But I think the intention of this was to say if you want to look at the properties, here is a place you can go find that document."    (Doc. 52-1, Bordelon Dep. at 95-97).   Ralph Bradley owned the Bradley Override until March 20, 2017, when he assigned it to Jacqueline M. Bradley, his wife, and that assignment was thereafter recorded in Belmont, Monroe, and Noble

Counties.   (Doc. 33 at ¶ 24; Assignment of Bradley Override to Jacqueline M. Bradley).   Ralph

Bradley passed away on March 23, 2017.[3]

Following the TransAtlantic-Eastern Assignment, Eastern went through a series of

mergers, name changes, and intercompany transfers.   Eastern's interests in the Leases were

ultimately transferred to NCL Appalachian Partners, LP ("NCL").   (Doc. 1, Compl. at ¶ 13).

NCL then assigned its interests in the Leases to Northwood Energy (the "NCL-Northwood

Assignment").   The NCL-Northwood Assignment provides that Northwood Energy acquired

NCL's interest in the Leases subject to all overriding royalty interests which are of record.   (*Id*.).

Specifically, the Assignment Bill of Sale and Conveyance states that Northwood Energy's newly-

acquired interest was "expressly made subject to:"

> (D) a proportionate part of all overriding royalty interests, restrictions, exceptions, reservations, burdens, encumbrances, conditions, limitations, interests, instruments, agreements and other matters, if any, which are of record in the state and county above named and which burden or affect the properties, rights or interests herein assigned.[4]

(Doc. 1-1, Compl. Ex. A).   Additionally, included in the Purchase and Sale Agreement, Buyer

(Northwood) had a right to conduct due diligence.   In Section 8(1), "Prior to the closing Date,

Seller will permit Buyer and its duly authorized representatives to have reasonable access to the

---

[3] Although there is no evidence in the record as to when the well or wells that would have triggered the Bradley Override were drilled and when Antero (or prior owners of the Leases) would have been required to pay the 5% overriding royalty interest, Defendants do request that if the Bradley Override is restored, any amounts due and owing should be paid to the Estate of Ralph Bradley if payable prior to March 20, 2017, and to Mrs. Bradley on or after March 20, 2017.

[4] Pursuant to NCL-Northwood Assignment, Northwood Energy agreed to take the Leases subject to any overrides relating to any of the Leases which are recorded in any of the three counties at issue. The Bradley Assignment was recorded in Belmont County and Monroe County.   The Leases were contained and described within Exhibit A to that assignment.

premises and the books, contracts, commitments and records relating to the Assets." (Doc. 49-7, pp. 54–59). Ralph Talmage (Northwood's founder), however, testified that he never made a request to examine those records. (Doc. 47-2, Talmage Dep. at 228–29).

Around the same time, Northwood Energy was also preparing to acquire the 50% interest in the undeveloped portions of the Leases that TransAtlantic had retained. (Doc. 1 at ¶ 14; Doc. 1-2). Then, in 2012, Northwood Energy entered into a purchase and sale agreement with Gulfport covering various oil and gas leases and wells, including the Leases at issue in this case.

In February and March of 2010, prior to the sale of the Leases to Gulfport, Northwood Energy and Talmage received a series of emails from Joseph W. Haas, of Reserve Energy Exploration, wherein Mr. Haas detailed the terms of the Bradley Assignment and provided a copy. (Doc. 49-5–7, Talmage Dep., Exs. 29–32). Next, Northwood Energy received an email dated December 7, 2010, from another oil and gas company, Protégé Energy, providing a due diligence report on an oil and gas lease included within the Shaw Unit that explicitly identified the Bradley Override and the recording information for the Bradley Assignment. (Doc. 49-5–7, Talmage Dep., Ex. A at 114–22, Ex. 33 at 4).

Additionally, in August of 2012, while Northwood Energy and Gulfport were still working out the terms of an agreement, Ralph Bradley sent correspondence to Northwood Energy detailing the Bradley Override and providing Northwood with a copy of the Bradley Assignment and the TransAtlantic-Eastern Assignment. (Doc. 49-5–7, Talmage Dep. Ex. A at 146–48, Ex. 38; Doc. 48-8, Decl. of Attorney Matthew Onest at ¶ 3). Northwood Energy, through Talmage, responded to Ralph Bradley's letter and stated that Northwood was "aware of" the Bradley Override. (Doc. 49-6, Talmage Dep. Ex. 39).

Ultimately, Gulfport closed its deal with Northwood Energy. Prior to closing that transaction, Northwood Energy assigned overriding royalty interests to trusts established by Ralph Talmage and David Haid, covering numerous oil and gas leases, including many of the Leases from the original Transatlantic-Eastern Assignment. (Doc. 1, Compl. ¶¶ 15–18; Doc. 1-5, Talmage/Heid Assignment). The Talmage/Haid Assignment specifically provided:

> The Overriding Royalty Interests are payable out of all oil, gas and associated hydrocarbons produced, saved and sold, on a lease by lease basis, from the Leases and shall be equal, in the aggregate for each Lease, to the difference between (i) eighteen percent (18%) and (ii) the sum of all burdens existing on a Lease including, without limitation, royalty, overriding royalty, net profits interests, and other similar interests of record affecting or burdening Assignor's interest in any given lease conveyed hereby as of the execution date hereof (the "Effective Date"). Should the burdens of record affecting or burdening the Assignor's interest in such lease being conveyed as of the Effective Date equal or exceed eighteen percent (18.00%), there shall be no overriding royalty interest conveyed.

(*Id.*). In the Purchase and Sale Agreement between Northwood and Gulfport, Northwood guaranteed a "100% working interest equal and not less than eighty-two percent (82%) net revenue interest in each of the leases owned of record by Northwood Energy." (Doc. 48-3 at 3).

Gulfport subsequently entered into an agreement to sell and assign its interests in some of the Leases to Antero. (*Id.* at ¶ 20; Doc. 33 at ¶ 38; Doc. 34 at ¶ 38; Doc. 36 at ¶ 38).[5]

In 2016, two former officers of Eastern, Barbara Bordelon and David Dresner, at the request of Ralph Bradley, recorded affidavits of fact related to the Leases in Noble County, Ohio. (Doc. 1-7; Doc. 1-8; Doc. 48-9). Ms. Bordelon prepared the Bradley Assignment, and Mr.

---

[5] Despite a request from the Court, the Gulfport to Antero Trade Agreement has not been provided. However, Gulfport and Antero represent that Gulfport assigned all of its right, title and interest in identified leases to Antero, including all working interest, overriding royalty interests, net profit interests, etc. The Trade Agreement further provided a specific minimum net revenue interest ("NRI") of 82% that Antero was to receive for each identified lease subject to the Trade.

Dresner signed the Bradley Assignment.    (Doc. 48-9).    These Affidavits stated that: (1) Eastern intended for the Bradley Override to cover the Leases in Noble County, and (2) Eastern was tasked with recording the 02059810-3 / 28877.00-0001 9 Bradley Override in all three counties, but through inadvertence failed to record it in Noble County.    (*Id*.).

## II.    STANDARD OF REVIEW

The parties have filed cross-motions for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.    Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(a).    The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).    A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.    *Id*. at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).    If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.    *See* Fed. R. Civ. P. 56(e); *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that

results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

## III. DISCUSSION

The parties have filed cross-motions for partial summary judgment on their cross-claims for declaratory judgment and quiet title regarding whether the Bradley Override is valid and enforceable. Defendants have also moved for summary judgment on Plaintiffs' slander of title and breach of contract counterclaims/cross-claims. The parties each submit multiple arguments in support of their positions. The Court will address each in turn.

### A. Declaratory Judgment

The parties are both seeking a declaratory judgment in their favor on whether the Bradley Override is valid and enforceable. As set forth above, the Bradley Override was conveyed via the Bradley Assignment in 1994. Bradley was granted "an overriding royalty interest of five percent (5%) of 8/8ths (the "ORRI") in and to all of the acreage subject [to] the Leases and in and to all oil and gas produced from, or allocated to, said Leases, . . .". (Doc. 33-4). The Leases referenced in the Assignment are specifically set forth in Exhibit B to the TransAtlantic-Eastern Assignment which include leases in Noble, Monroe, and Belmont counties. (Doc. 33-1).

Plaintiffs (the Talmage and Haid Trusts) and Third Party Defendant Northwood (hereinafter collectively referred to as the "Northwood Parties") assert that summary judgment should be entered in their favor because Ohio's oil and gas specific recording statute (Ohio Revised Code § 5301.09) and the general recording statute (Ohio Revised Code § 5301.25) bar

enforcement of an assignment of unrecorded overriding royal interest against interests in properties that are located outside of the county in which the assignment was recorded. Defendants (also referred to as the "Bradley Parties" but not inclusive of Gulfport and Antero who are not participating in the summary judgment briefing), however, rely solely on the contract language in support of their claim for declaratory judgment.

### 1. Ohio Revised Code § 5301.09[6]

Ohio Revised Code § 5301.09 (and its predecessor Ohio Revised Code § 4112a), govern the recording of oil and gas leases. The statute specifically states:

> In recognition that such leases and licenses create an interest in real estate, all leases, licenses, and assignments thereof, or of any interest therein, given or made concerning lands or tenements in this state, by which any right is granted to operate or to sink or drill wells thereon for natural gas and petroleum or either, or pertaining thereto, shall be filed for record and recorded in such lease record without delay, and shall not be removed until recorded. . . .

> No such lease or license is valid until it is filed for record, except as between the parties thereto, unless the person claiming thereunder is in actual and open possession.

Ohio Rev. Code § 5301.09.

The Northwood Parties argue that 1994 Bradley Assignment in Noble County is not enforceable because it was not recorded as required under the aforementioned statute. Defendants, however, argue that this recording statute does not apply to overriding royalty interests, contending that it is applicable "only to leases and licenses as real property interests that grant the right to operate or drill wells." (Doc. 54, Defs.' Memo. in Opp. at 12). Defendants

---

[6] Because federal jurisdiction in this case is premised on diversity, the Court applies Ohio substantive law. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).

argue that the overriding royalty interest is not a lease, license, assignment, or interest in any lease. Defendants state that the recording statute specifically applies to "interest in real estate" and "unlike leases and licenses and assignments thereof, overriding royalty interests are not real property interests; they are personal property interests in the proceeds of produced oil and gas." (*Id*. at 13).

Relying on principles of statutory interpretation, Defendants assert that the recording statute does not expressly apply to overriding royalty interests and the Court may not add words to the statute. (*Id*., citing *State ex rel. Baroni v. Colletti*, 957 N.E.2d 13, 19 (Ohio 2011) ("The plain language of these provisions does not support Baroni's interpretation, and we cannot create this legal duty by adding language to the pertinent provisions."). Further, Defendants argue that the cases cited by Plaintiffs in support of their position do not support their theory that this statute applies to assignments of overriding royalty interests. The Court agrees that there are no cases that specifically state that this statute applies to overriding royalty interests; however, that does not mean that the statute cannot be applied in this case. Just as there is no exact case on point to support Plaintiffs' arguments, Defendants have not cited to any caselaw holding that assignments of interests in oil and gas leases are not required to be recorded.

Ohio Revised Code § 5301.09 applies not only to leases and licenses, but it also requires recording of "assignments thereof, or of any interest therein." In *Douce v. Donelson*, 1978 Ohio App. LEXIS 8130, at *6 (Ohio Ct. App. 1978), the Court stated that "R.C. 5301.09 provides that ***all assignments of any interest in a lease*** of gas or oil lands must be recorded without delay." (Emphasis added).

Plaintiffs argue, and the Court agrees, that an overriding royalty interest is an interest in an oil and gas lease. Ohio case law has defined an overriding royalty interest as:

> An 'overriding royalty' is a fractional interest in the gross production of oil and gas under a lease in addition to usual royalties paid to the lessor, free of any expense for exploration, drilling, development, operating, marketing and other costs incident to the production and sale of oil and gas produced from the lease.

*GM Gas Exploration, Inc. v. McClain*, 4th Dist. Athens No. 1438, 1991 Ohio App. LEXIS 4083, *22 (Aug. 13, 1991). The *GM* court continued, stating that an overriding royalty interest "is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, as distinguished from the owner's reserved royalty interest." *Id.,* citing *Meeker v. Ambassador Oil Co.*, 308 F.2d 875 (10th Dist. 1962).

The Ohio Supreme Court reinforces Plaintiffs' arguments when discussing the predecessor to Ohio Revised Code § 5301.09, Ohio Revised Code § 4112a:

> A lease or license to operate upon land for natural gas or petroleum, until filed for record as required by section 4112a of the Revised Statutes, is without any effect, either at law or in equity, as against a subsequent lessee, or licensee, or other third person acquiring an interest in or lien on the land, although he took with notice of such prior unrecorded lease or license, unless the person claiming thereunder was at the time in the actual possession of the land.

*Northwestern Ohio Natural Gas Co. v. City of Tiffin*, 59 Ohio St. 420, 54 N.E. 77 (1899).

Defendants counter that the leading phrase of Ohio Revised Code § 5301.09 states that this statute only applies to interests in real estate, and therefore it does not apply to overriding royalty interests because they are not real property interests, but are personal property interests. The Court does not find this argument persuasive. An overriding royalty interest is personal property, but it is also an interest in an oil and gas lease. The interest does not exist independent of the oil and gas lease.

Plaintiffs argue that "[i]f overriding royalty interests in an oil and gas lease do not need to be recorded, the statute's object is thwarted and an examination of the record will not reveal the full extent to which an oil and gas lease burdens a landowner's property." (Doc. 61, Pls.'s Reply at 7). Finally, Plaintiffs inquire, "if overriding royalty interests are not supposed to be recorded, why was this done" in Belmont and Monroe Counties? (*Id*. at 10). Not only was it the law, but it was the "standard practice for the Company to record such assignment in each county in which the applicable leases were located." (Doc. 48-9, Dressner Aff. at ¶ 5). The Court agrees that it was standard practice to record overriding royalty interests like the Bradley Override and it should have been recorded in Noble County. Unfortunately, it seems that the fact that the 1994 Bradley Assignment was filed in both Belmont and Monroe Counties, but not in Noble County was simply a mistake.

### a.     Exceptions to Ohio Revised Code § 5301.09

Having found that Ohio Revised Code § 5301.09 is applicable to overriding royalty interests such as the Bradley Override in this case, the Court considers two exceptions to the statute asserted by Defendants. Those exceptions are: (1) the recording requirement is not applicable between the contracting parties, and (2) the recording requirement is not applicable if the person claiming the interest is in actual and open possession. Plaintiffs respond that none of the parties that Defendants are attempting to enforce the 1994 Bradley Assignment against were parties to that assignment. The sole parties were Ralph Bradley and the company he owned, Eastern States. Additionally, Plaintiffs argue that Defendants cannot claim actual and open possession because they are seeking to enforce an overriding royalty interest which does not entitle the owner to have actual and open possession to the underlying leased land and/or wells.

### (i)      **Actual and Open Possession**

The Court agrees with Plaintiffs that the actual and open possession exception is not applicable to the circumstances of this case as the Bradley parties are not in actual and open possession.    Again, the dispute in this case involves an overriding royalty interest, not the actual oil and gas well, or the lease of the land upon which the well sits.   In the *Douce* case, the court addressed this exception and found that holding only an overriding royalty interest did not constitute owning a working interest in the wells.   The court therefore found that "since the defendant has no working interest, it has no right to come upon the plaintiffs' premises."  *Douce*, 1978 Ohio App. LEXIS 8130 at *7.   The court ultimately concluded that the exception of "actual and open possession" was without merit because overriding royalty interests do not provide a right to possession.  *Id.*  The same conclusion must be drawn here.

### (ii)      **Contracting Parties**

With respect to the exception regarding the contracting parties, the Court again agrees with Plaintiffs that none of the parties against whom Defendants seek to enforce the 1994 Bradley Assignment (the Northwood Parties, Gulfport, and Antero) were parties to the 1994 Bradley Assignment.  The 1994 Bradley Assignment was made by Eastern States to Ralph Bradley. However, the Court must consider principles of contract law to determine whether any subsequent parties who either merged with Eastern, or assumed rights and responsibilities pursuant to an assignment and/or purchase agreement, could be deemed as standing in the shoes of Eastern for purposes of the aforementioned exception to Ohio Revised Code § 5301.09.   Defendants' primary argument in support of enforcing the Bradley Override is the contractual obligations of the parties, therefore, the Court will address this below.

## 2. Ohio Revised Code § 5301.25

Plaintiffs argue in the alternative to § 5301.09, that Ohio's general recording statute applies to bar enforcement of the 1994 Bradley Assignment in Noble County. Ohio Revised Code § 5301.25 states:

> § 5301.25 Recording of instruments conveying or encumbering lands; name of surveyor; exceptions; tax certificates.
>
> (A) All deeds, land contracts referred to in division (A)(21) of section 317.08 of the Revised Code, and instruments of writing properly executed for the conveyance or encumbrance of lands, tenements, or hereditaments, other than as provided in division (C) of this section and section 5301.23 of the Revised Code, shall be recorded in the office of the county recorder of the county in which the premises are situated. Until so recorded or filed for record, they are fraudulent insofar as they relate to a subsequent bona fide purchaser having, at the time of purchase, no knowledge of the existence of that former deed, land contract, or instrument.

Ohio Rev. Code § 5301.25.

This general recording statute protects bona fide purchasers of land by deeming fraudulent an instrument conveying or encumbering land that is not recorded in the county in which the land is located. Plaintiffs, relying on this principle, argue that the 1994 Bradley Assignment is fraudulent as to any Noble County interest because the 1994 Bradley Assignment was not recorded in Noble County and neither Northwood, nor its predecessor, NCL, had actual knowledge of the unrecorded 1994 Bradley Assignment when they acquired their interests in 2005 and 2006.

Defendants raise a number of arguments as to why this statute should not be applied in this case. First, Defendants continue to maintain that overriding royalty interests are personal property and therefore this statute is not applicable. However, this argument fails for the reasons already discussed in relation to Ohio Revised Code § 5301.09—even though overriding royalty interests are personal property and not real property, they are also an interest in an oil and gas lease

15

and can be subject to the aforementioned statute. Further, Plaintiffs argue, and the Court agrees, that the plain language of the statute demonstrates that it applies to overriding royalty interests. Ohio Revised Code § 5301.25 governs instruments executed for the "conveyance or encumbrance" of "lands, tenements, or hereditaments." An oil and gas lease—and any assignments or interests related to the lease—clearly encumber land, tenements, or hereditaments. Assigning an overriding royalty interest encumbers the landowner's property because the landowner is no longer receiving the unencumbered use of the mineral estate, or the entirety of the proceeds from the wells.

### a. Bona Fide Purchaser

Defendants argue in the alternative, that if Section 5301.25 does apply to overriding royalty interests, the Northwood Parties cannot be considered bona fide purchasers[7] for value under any of their theories. Plaintiffs counter that Northwood was a bona fide purchaser lacking knowledge of the 1994 Bradley Assignment. Plaintiffs rely on *Emrick v. Multicon Builders, Inc.*, 57 Ohio St.3d 107, 566 N.E.2d 1189 (1991), in support of their position that the Bradley Parties must establish actual knowledge of all of the Northwood Parties' predecessors in title to avoid application of the statute. In *Emrick*, in 1949 and 1950, landowners of property located in two separate counties—Franklin and Delaware—executed a "restriction contract" placing various restrictions on the subject property, including a requirement that establishment of a business area

---

[7] According to Black's Law Dictionary, a bona fide purchaser is: "Someone who buys something for value without notice of another's claim to the property and without actual or constructive notice of any defects in or infirmities, claims, or equities against the seller's title; one who has in good faith paid valuable consideration for property without notice of prior adverse claims. Black's Law Dictionary (10th ed. 2014).

required the association's approval. 57 Ohio St. at 107–11. In 1988, Multicon purchased property in Delaware County located within the restricted territory for purposes of building a shopping mall. However, at the time of the purchase, the restriction contract was not filed in Delaware County. The landowners argued that Multicon had knowledge of the restrictions because Multicon also purchased land in Franklin County that had the recorded restriction covenant in place. The Ohio Supreme Court rejected this argument finding that "[a] reading of the Restriction Contract upon discovery of recorded restrictions in one county does not constitute clear and convincing evidence of actual knowledge of an unrecorded restriction in a different county ten years later." *Id.* at 110. The Ohio Supreme Court held:

> An unrecorded land use restriction is not enforceable against a bona fide purchaser for value unless the purchaser has actual knowledge of the restriction. Although actual knowledge in some instances may be inferred, it may not be imputed to the purchaser on the basis of mere familiarity with the land use restriction recorded in another county, or on the basis of awareness of the bare existence of the document containing the restrictions.

*Emrick,* 57 Ohio St.3d at 110.

Plaintiffs argue that their predecessors in interest were bona fide purchasers for value and therefore all subsequent purchasers, including Northwood, obtain title free and clear of the Bradley Override. Defendants counter that none of the predecessors in interest to the Northwood Parties were bona fide purchasers for value, but rather, took their interests by merger. The Court agrees. Eastern States changed its name to Equitable Production–Eastern States, Inc., which then merged into Equitable. (*See* Docs. 54-2 and 54-3). Equitable then conveyed the Leases to its wholly owned subsidiaries, AB Production, LLC and AB Production II, LLC, and then those companies merged into NCL. (*See* Docs. 49-4 and 49-8). Defendants, in turn, reference a number of cases that establish a successor corporation succeeds to all rights and obligations of the constituent

corporation, including contractual obligations. *See, e.g., Transcontinental Ins. Co. v. SimplexGrinnell LP*, 2006 U.S. Dist. LEXIS 48654 (N.D. Ohio 2006) (holding there was no need to assign contractual obligations in the context of a merger); *Huggins v. Commerical & Savings Bank*, 140 S.E. 177, 190 (S.C. 1927) ("Where there is an absorption of the business and assets— in other words, a merger de facto—either by a corporation formed for the purpose, or by one already in business, . . . such receiving corporation does not stand as a bona fide purchaser for value.").

Therefore, Defendants need to establish actual knowledge by Northwood, the first company to actually purchase the Leases at issue in this case, as opposed to every company in the line of successors to Eastern States as Plaintiffs contend. Under Ohio law, "[t]he burden of showing such actual knowledge" is on the party seeking to enforce the unrecorded encumbrance. *Emrick*, 57 Ohio St.3d at 109. Moreover, such burden of proof is "clear and convincing evidence that [a purchaser] had actual knowledge at the time of purchase that the restrictions applied to its land." *Emrick*, 57 Ohio St.3d at 110; *see also Church at Warren v. Natale*, 1997 Ohio App. LEXIS 2138 (Ohio Ct. App. 1997) ("[Emrick] held that the party who asserts that the bona fide purchaser had actual or constructive knowledge must prove this assertion by clear and convincing evidence.").

Defendants have pointed to several instances that call into question what NCL and the Northwood Parties knew about the Bradley Assignment and Bradley Override prior to finalizing the NCL to Northwood Assignment. First, Michael Nicol's affidavit acknowledges that NCL did due diligence with respect to the interests in Belmont, Monroe and Noble Counties. (Doc. 49-4 at ¶ 5). Defendants acknowledge that Nicol said the due diligence was limited, but suggest that:

even the most basic analysis of title would inevitably lead one back to the TransAtlantic-Eastern Assignment from which these interests originated, as well as the Bradley ORRI Assignment marginally noted on that document and otherwise on file in Belmont and Monroe Counties. It strains credulity to suggest that NCL would not have at least assured itself of the details of a title document like this that is so fundamental to the transaction. The likelihood that it would have done so is strengthened by the fact that these properties were transferred as a group and therefore had common ancestral title documentation.

(Doc. 54, Defs.' Resp. in Opp. at 21).

Plaintiffs further point out that Nicol carefully states that "NCL had no knowledge of any unrecorded assignment of overriding royalty interests from Eastern States Oil & Gas, Inc. to Ralph L. Bradley in the Noble County, Ohio properties . . . ." (Doc. 49-4 at ¶ 6). But Nicol does not say that NCL lacked actual knowledge of the Bradley Assignment or Bradley Override. Additionally, despite Northwood denying that it did any due diligence, during Talmage's deposition he ultimately conceded, after being presented with several documents from Northwood's files that Northwood's broker (Sam Buckey) sent Northwood notes from work he performed "run[ning] a chain of title." (Docs. 47-2 at 195-96; 239-244; 192:12-15; 251:10-23; 257). Talmage conceded that some "title due diligence" was performed after being confronted with an email sent to him from Michael Lord with NCL stating that he was attaching information "from Equitable based on our request on your behalf," and that his request was part of "title due diligence." (*Id.* at 251; Doc. 49-7, p. 79).

Defendants therefore argue that there is a genuine issue of material fact as to whether Northwood was a bona fide purchaser for value and whether Northwood had actual knowledge of the Bradley Assignment and Bradley Override. Defendants suggest that the Northwood Parties proposed proof of lack of actual knowledge rests on the testimony of witnesses whose credibility has been called into question. Summary judgment is typically not appropriate where, as here, the

non-movant offers specific facts that call into question the credibility of the movant's witnesses. *Sweat v. Shelton*, 595 Fed. Appx. 508, 512 (6th Cir. 2014).

The Court agrees with Defendants that there is a genuine issue of material fact as to whether Northwood had knowledge of the Bradley Assignment and Bradley Overrride and was a bona fide purchaser for value. The Court need only look to the deposition testimony and affidavit of Ralph Talmage to illustrate the questions of fact as to what the Northwood Parties knew about the Bradley Assignment and when. Talmage's testimony in this case is at the very least riddled with inconsistencies, or possibly intentionally false because he personally stands to gain if the Bradley Override is not enforced. If the Bradley Override is enforced, both the Talmage and Haid Trusts overriding royalty interest is diminished because Northwood guaranteed a certain amount of working interest and overriding royalty interest to Gulfport in the Northwood-Gulfport Assignment.

It is concerning that Plaintiffs represent that they have no knowledge of the Bradley Override when there was at least minimal due diligence performed. It is troubling that Talmage misrepresented the extent of due diligence performed by Northwood during the acquisition. Further, in Talmage's Affidavit, he stated:

> At no time prior to December 29, 2011 (including but not limited to prior to January 26, 2006; December 21, 2011, and December 27, 2011) did Northwood Energy Corporation (or Ralph Talmage or David E. Haid) know that certain overriding royalty interests (including unrecorded ones pertaining to Noble County properties) allegedly were previously assigned by Eastern States to Ralph L. Bradley or that such overriding royalty interest allegedly (i) concerned interests, including leases, transferred to Northwood Energy Corporation via the NCL-Northwood Assignment and/or the re-recorded NCL Northwood Assignment; and/or (ii) concerned the overriding royalty interest assigned via the Northwood-Talmage-Haid Partial Assignment.

(Doc. 49-6 at pp. 19–21).   But we also know this statement to be false as there was an email exchange between Joseph Haas with Reserve Energy and Talmage specifically referencing the Bradley Override and even attaching a copy of it.   (Doc. 49-6 Talmage Dep. Exs. 29–31).

Northwood, as the purchaser and assignee of the Leases subject to any and all overriding royalty interests had the right to and a duty to examine the chain of title.   There is no dispute that Northwood was aware of the Bradley Assignment in the counties where it was recorded—Belmont and Monroe.   However, this same document was filed in both of those counties and referenced the exhibit Leases in three counties—Belmont, Monroe, and Noble.

> Well settled Texas law provides that [A] purchaser is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims.   *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982).   The rationale of the rule is that any description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of all the matters referred to and affecting the estate is obtained.   *Id.*

*Waggoner v. Morrow*, 932 S.W.2d 627, 632 (Tex. Ct App. 14th Dist. 1996).   The Leases set forth in detail as exhibits to the TransAtlantic-Eastern Assignment were incorporated by reference in the Bradley Assignment.   Even a cursory review of the chain of title would have put the reviewer on notice that those subject Leases were located in three counties—Belmont, Monroe and Noble.

Further, Defendants argue, and the Court agrees, that the *Emrick* case is distinguishable from the case at bar.   *Emrick* involved land use restrictions that were not clear on the face of the instrument when the land was purchased.   However, in this case, the Assignment was one document which referenced application to Leases clearly listed in three counties—Noble, Belmont, and Monroe.   Additionally, the purchases of the land in *Emrick* occurred years apart.   The

Leases in this case have always traveled together from TransAtlantic to Northwood. Northwood acquired its interests in all the Leases in all three counties in one transaction. Northwood conducted title searches and due diligence on the properties at the same time. Finally, there was no obligation on subsequent purchasers of the land in *Emrick* to recognize the restriction contract, whereas in this case, there is a contractual obligation on Northwood who took the Leases by Assignment, that they were taking the Leases subject to "a proportionate part of all overriding royalty interests, restrictions, exceptions, reservations," etc. (Doc. 49-8, NCL-Northwood Assignment).

In conclusion, the Court cannot make a final decision as to whether Northwood was a bona fide purchaser as there is a question of fact as to what Northwood knew at the time the NCL-Northwood Assignment was made.

### 3. Consequences of Failure to Record

Having found that the overriding royalty interest should have been recorded in Noble County, what is the consequence of failing to record it? Plaintiffs argue that Ohio case law has applied Ohio Revised Code § 5301.09 to invalidate any instrument that was required to be recorded but wasn't. (Doc. 61, Pls.' Reply at 14). Plaintiffs reference three cases in support of their position that assignments of interests in oil and gas leases should be invalidated if not recorded. *Douce*, 1978 Ohio App. LEXIS 8130 (counterclaim dismissed due to "failure to define its interest and for its non-compliance with R.C. 5301.09"); *In re Bethel Resources, Inc.*, 79 B.R. 717 (following some discussion by the Bankruptcy Court as to whether the interests involved working interests or overriding royalty interests, the Court stated that "no dispute exists as to the mechanism which must be used to perfect those interests [§5301.09] regardless of their characterization" and

"Section 5301.09 makes it clear that assignments of working interests in oil and gas leases must be recorded in the appropriate county lease records before the interest of the assignee is protected from adverse claims by a person not a party to the assignment"); and *Keystone Bank of Pittsburgh v. Union Oil Co.*, 1903 Ohio Misc. LEXIS 255, 25 Ohio C.C. 464 (Cir. Ct. 1903) (unrecorded transfer of working interest in an oil and gas lease not valid). Plaintiffs summarize that the common thread amongst the aforementioned cases is that Ohio Revised Code § 5301.09 invalidates unrecorded "interests" in oil and gas leases, and an overriding royalty interest is an example of one such interest.

Based on the aforementioned analysis of both recording statutes, the Court finds that there is a question of fact as to whether the Northwood Parties were aware of the Bradley Assignment and the exception(s) to the recording statute(s) apply. Therefore, at this time, the Court declines to invalidate the Bradley Assignment on the Noble County Leases based on the failure to record in Noble County.

There is no question that by the time that Gulfport acquired the Leases and eventually Antero, they were fully aware of the Bradley Assignment and Override. Northwood admits that no wells were drilled that would have triggered payments to Bradley while they owned the Leases. Northwood contends "[t]he only new wells that have been drilled pertinent to this matter were drilled by Gulfport and Antero, and those were drilled after Northwood partially assigned the deep rights to Gulfport in 2012 (which then transferred some of those rights to Antero)." (Doc. 51, Pls.' Resp. at 22). Therefore, by the time Bradley was owed any money on his Override, all parties involved were aware of the Bradley Assignment and Override. On August 23, 2012, Bradley contacted Northwood in writing to inquire about the status of any newly drilled wells.

(*See* Doc. 49-6 at p. 151).   Ralph Talmage, on behalf of Northwood responded in writing which stated:

> Northwood Energy Corporation has not drilled any new wells on the paper work you sent us per your August 23, 2012, letter.   We have a Joint Venture with Protégé LLC II, that has drilled a well called the Eisenbarth.   The well should be online sometime on November 2012.   We are aware of your ORRI in these leases and I have enclosed the draft of the division of interest schedule.

(Doc. 49-6 at p. 176).

Further, Bradley has attempted to cure the deficiency in title by recording the transfer of his Override to his wife on March 20, 2017.   And prior to that, in 2016, two former Eastern employees Barbara Bordelon and David Dresner, at the request of Ralph Bradley, recorded affidavits of fact related to the Leases in Noble County, Ohio.   (Doc. 1-7; Doc. 1-8; Doc. 48-9). Ms. Bordelon prepared the Bradley Assignment, and Mr. Dresner signed the Bradley Assignment. (Doc. 48-9).   These Affidavits stated that: (1) Eastern intended for the Bradley Override to cover the Leases in Noble County, and (2) Eastern was tasked with recording the 02059810-3 / 28877.00-0001 9 Bradley Override in all three counties, but through inadvertence failed to record it in Noble County.   (*Id.*).   Therefore, based on these actions, Ohio Revised Code § 2719.01 could apply. Ohio Revised Code § 2719.01 provides in pertinent part that "[w]hen there is an omission, defect, or error in an instrument in writing" which renders a document "not in strict conformity with the laws of this state, the courts may give full effect to such instrument" so as to manifest the intent of the parties.   The Court, however, declines to render a final decision on the application of this statute to the case at this time without additional testimony as to the intent of the parties.

### 4. Contractual Obligations

Regardless of whether Ohio's recording statute above applies, Defendants argue that the "Northwood Parties owe contractual obligations to the Bradley Parties to honor the Bradley Override. Those duties exist independent of the effect of any recording statute." (Doc. 54, Defs.' Memo. in Opp. at 18). Defendants assert that even Ohio Revised Code § 5301.09 acknowledges this right and preserves the contractual obligations of the parties by stating: "No such lease or license is valid until it is filed for record, *except as between the parties thereto*, unless the person claiming thereunder is in actual and open possession." (Emphasis added).

Defendants generally argue that overriding royalties, and the instruments creating them, should be interpreted like any ordinary contract and there is a contractual obligation to honor the Bradley Override. (Doc. 48, Defs.' Mot. for Partial Summ. J. at 11). Defendants argue that the Bradley Assignment contains two contractual obligations: (1) the lessee agreed to pay the owner of the Bradley Override a proportional share of future revenue generated from any future production on the Leases; and (2) the Bradley Assignment obligated the lessee of the Leases to make all future assignment of the Leases subject to the Bradley Override. (*Id*.). Based on these contracts, Defendants argue that Northwood Energy agreed to be bound by the Bradley Override.

Plaintiffs do not dispute the contractual language, but continue to argue that the overriding royalty interest must be recorded, even under the terms of the original contract. Plaintiffs refer the Court to the NCL-Northwood Assignment Section (D) which states that the assignment is subject to:

> (D) a proportionate part of all overriding royalty interests, restrictions, exceptions, reservations, burdens, encumbrances, conditions, limitations, interests, instruments, agreements and other matters, if any, *which are of record in the state and county* above named and which burden or affect the properties, rights or

interests herein assigned;

(Doc. 49-8, NCL-Northwood Assignment at 3) (emphasis added).

There is no dispute as to the underlying contractual obligations; however, the assignment to Northwood was only subject to overriding royalty interests "which are of record in that state and county above named." The Bradley Assignment was not recorded in Noble County. Therefore, the Bradley Assignment was not "of record" in Noble County. The Bradley Assignment was "of record" in Belmont and Monroe Counties and therefore valid.

The Court does not agree with Defendants that to reach the conclusion sought by Plaintiffs, it would require adding words to the statute, as the word "interest" is in the term "overriding royalty interest." Therefore, the Court finds that an overriding royalty interest is an interest in an oil and gas lease. Further, the Court finds that the contractual language relied upon by Defendants is consistent with Ohio law requiring that interests in oil and gas leases be recorded in the county where the property subject to the lease is located. *See Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185 (Ohio 2015).

Therefore, the Court once again finds itself reaching the same conclusion as in the preceding section—the Bradley Assignment should have been recorded in Noble County; however, since it was not, is there some exception that applies?

Defendants assert that Northwood was in the line of succession of lessees of the Leases originally transferred from TransAtlantic to Eastern via the TransAtlantic-Eastern Assignment. Eastern, who received the leases from the original TransAtlantic-Eastern Assignment, went through a series of name changes and NCL ultimately retained all those original interests and then

NCL assigned any and all interest it had in the Leases to Northwood Energy.[8]   Defendants argue

that under Ohio law "an assignee of a contract succeeds to the same rights, duties and liabilities of

his assignor . . . ."   (Doc. 48, Defs.' Mot. for Summ. J. at 12, citing *Gray v. McFarland*, 1977

Ohio App. LEXIS 8401 (Ohio Ct. App. 1977)).

Defendants reference Sections (D) and (E) of the NCL-Northwood Assignment.   Section

(D) is cited above and Section (E) states:

This Assignment from Assignor to Assignee is expressly made subject to:

* * *

(E) the terms and conditions contained in the joint operating agreement or
agreements, if any, which covers and affects any of the Leases and the lands
covered thereby and any other existing or executory farmout agreements, farmin
agreements, letter agreements, contract or other agreements which relate to any of
the properties, lands or interests described in Exhibit A, if any[.]

(Doc. 49-8).   Therefore, based on the contract language, Defendants argue that Northwood is

contractually obligated to pay the Bradley Override.   Defendants extend this even further by

asserting that Talmage, Haid, and Gulfport, as assignees of Northwood Energy are bound to any

and all obligations of Northwood Energy, and also that Antero, as an assignee of Gulfport, is also

bound.

The Court agrees that the Bradley Override and assignment thereof created a contractual

obligation, but the question before this Court is whether that contractual obligation is enforceable

---

[8] The original assignment of the Leases at issue in this case was from TransAtlantic to Eastern,
then Eastern transferred its interests to Equitible Production Company and Eastern States 1997 Fund
(collectively referred to as "Equitible").   Equitible's interests were then transferred to two entities:   AB
Production, LLC and AB Production, II, LLC, and then those entities were merged into NCL Appalachian
Partners, LP ("NCL").   NCL then sold their interest in the Leases located in Belmont, Monroe, and Noble
counties—i.e., the interests originally transferred via the TransAtlantic-Eastern Assignment—to
Northwood Energy.   (*See* Docs. 54-2 and 54-3).

upon any parties to this case?    And, does the failure to record the Bradley Assignment in Noble County void the underlying contractual obligation?

The Northwood Parties assert that they are not parties to the 1994 Bradley Assignment and therefore cannot be contractually obligated to the Bradley Parties.    However, this case is not that simple.    Eastern States, Bradley's employer and the company who made the Bradley Assignment eventually became NCL through a series of mergers and transfers of interests.    NCL then sold and assigned its interests in the Leases to Northwood on January 25, 2006.    (Doc. 49-8).

Here, the NCL-Northwood Assignment, by its plain language, conveyed the Leases from NCL to Northwood.    Northwood received all of the assignors "properties, rights, titles and interests which were formerly owned by Equitable Production Company and Eastern Series Trust in the counties of Noble, Monroe and Belmont;" subject to "all overriding royalty interests" "which are of record in the state and county above named."    (Doc. 49-8).    The Northwood Parties argue that Northwood was a bona fide purchaser of NCL's interest in the Leases and therefore not an assignee of that interest that succeeds to the same rights, duties and liabilities of his assignor.    The bona fide purchaser argument arises in response and as an exception to Ohio's general recording statute, Ohio Revised Code § 5301.25, which will be discussed below.

There is another argument based on a new case and submitted as supplemental authority by the Bradley Parties.    In *Neuhart v. TransAtlantic Energy*, 2018-Ohio-4099, ___ N.E.2d ___, 2018 Ohio App. LEXIS 4424 (Ct. App. 2018), Northwood raised many of the same arguments made in this case regarding an amendment letter to a lease that was never recorded.    Northwood argued that it was their predecessor, TransAtlantic, that was in possession of the lease and amendment letter and that "they should not be held to account for TransAtlantic's failure to record

the amendment." (*Id*. at ¶ 16). The court found that the landowners were "blameless for the failure to record the amendment letter" and instead held Northwood accountable based on the reasoning that "when Northwood purchased the lease file, Northwood stepped into TransAtlantic's place. Northwood has no greater rights or fewer duties than TransAtlantic possessed." (*Id*.). This decision supports the Bradley Parties' contention that the Northwood Parties are bound to the duties and obligations of their predecessor-in-title, irrespective of whether the documents which create those duties and obligations are recorded. However, the *Neuhart* case is not persuasive in that it lacks sufficient analysis to determine the application of the recording statutes to the general rule applied by the court.

### 5. Third-Party Beneficiary

Defendants also argue that Northwood Energy is contractually bound by the Bradley Override because Bradley was a third-party beneficiary to the NCL-Northwood Assignment. Under Ohio law, a party may enforce a contract to which it is not a named party if that party was an intended beneficiary to that contract. *Huff v. FirstEnergy Corp*., 130 Ohio St. 3d 196 (Ohio 2011). (Doc. 48, Defs.' Mot. for Summ. J. at 14). Ohio courts have defined a third party beneficiary as "one for whose benefit a promise is made, but who is not a party to the contract encompassing the promise." *Tolbert v. Coast to Coast Dealer Servs.*, 789 F. Supp. 2d 811, 817-18 (N.D. Ohio 2011), citing *Berge v. Columbus Community Cable Access*, 136 Ohio App. 3d 281, 736 N.E.2d 517, 532 (Ohio App. 1999). A court must examine the "language of the contract to determine if a party" is an intended beneficiary. *In re Nat'l Century Fin. Enters., Inc*., 377 Fed. Appx. 531, 540 (6th Cir. 2010). Defendants argue that Bradley was an intended beneficiary of

the NCL-Northwood Assignment because the language provides that Northwood Energy will assume any and all obligations with respect to the Leases, which includes the Bradley Override.

Plaintiffs counter that Bradley is not a third-party beneficiary of the NCL-Northwood Assignment. They assert that Bradley is not mentioned in the Assignment and since there was no knowledge of the Bradley Assignment at the time of the NCL-Northwood Assignment, then there would be no agreement or promise made to the alleged beneficiary–Bradley. Plaintiffs suggest that Bradley would be an incidental beneficiary at best. Under the test set forth by the Ohio Supreme Court, "[t]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Hill v. Sonitrol*, 36 Ohio St. 3d 36, 40 (1988) (adopting RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981)).

There is no question that if recorded, the Bradleys, through the Bradley Assignment, would be intended third-party beneficiaries to the NCL-Northwood Assignment and subsequent assignments of the subject Leases. However, because the Bradley Assignment was not recorded in Noble County, the analysis again turns to what the Northwood parties knew at the time they entered into the NCL-Northwood Assignment. As set forth above, there is a question of fact as to what was known at the time. Therefore, this determination cannot be made at this juncture.

**B.  Slander of Title**

Defendants move for summary judgment on Talmage and Haid's slander of title claim (Count Three), which is based solely on the Affidavits of Barbara Bordelon and David Dressner. Defendants argue that the Talmage and Haid Trusts cannot prove that these affidavits contain any false statement of fact and therefore their claim fails. Defendants further argue that they are

entitled to summary judgment because Plaintiffs cannot prove that Bradley made the alleged defamatory statement. Under Ohio law, "[s]lander of title is a tort action" that requires a claimant to prove: "(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages." *Columbia Gas Transmission Corp. v. Zeigler*, 83 F. App'x 26, 31 (6th Cir. 2003) (citing *Green v. Lemarr*, 139 Ohio App. 3d 414, 430-31, 744 N.E.2d 212, 224 (Ohio Ct. App. 2000)).

Plaintiffs respond that issues of fact exist that preclude granting summary judgment to Defendants. Plaintiffs, the Talmage and Haid Trusts, allege that the Bordelon and Dressner affidavits were published for the purpose of creating, and did create, a false impression that their Noble County interests were subject to the 1994 Bradley Assignment. (Doc. 1, Compl. ¶¶ 50–54). Plaintiffs further argue that the Affidavits were executed to cause the overriding royalty interests to be paid to Bradley to the detriment of the Talmage and Haid Trusts. (Doc. 51, Pls.'s Resp. at 36).

The Court finds that the statements made by Bordelon and Dressner in their affidavits appear completely truthful, and the evidence in the record, including the Bradley Assignment, confirm their statements. There must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *McKimm v. Ohio Elections Comm.*, 89 Ohio St. 3d 139, 2000 Ohio 118, 729 N.E.2d 364, 374 (Ohio 2000) (quotation omitted). Put another way, Ohio law requires that the defendant make the allegedly defamatory statement "with a subjective high degree of awareness that the statement was probably false." *Heinlen v. Ohio Civ. Serv. Employees Ass'n*, 2002-Ohio-1395, 2002 Ohio App. LEXIS 1383, at

31

*10 (Ohio Ct. App. 2002) (citing omitted); *see also* Restatement 2d. of Torts § 623A, cmt. d (1977) ("A principal basis for liability for injurious falsehood has been that the publisher knew that the statement was false or that he did not have the basis of knowledge or belief professed by his assertion."). Further, these statements, while they may benefit Bradley, were made by Bordelon and Dressner, not Bradley. *See Wiley v. Triad Hunter LLC*, No. 2:12-CV-00605, 2013 U.S. Dist. LEXIS 112066, *14-15 (S.D. Ohio Aug. 8, 2013) (Sargus, C.J.) (dismissing slander of title claim for "failure to plead any facts regarding an affirmative false statement on the part of [defendant] Triad justifies dismissal"). Finally, the Court does not find that Plaintiffs have sufficiently alleged that the affiants' statements were made malice or reckless disregard. Therefore, the Court grants summary judgment to Defendants on the Northwood Parties' slander of title claim.

## C.    Breach of Contract

In addition to the dispute regarding the Bradley Override in Noble County, the Bradley Parties allege that Defendants Gulfport and Antero have drilled oil and gas wells utilizing the Belmont and Monroe County Leases and are obligated pursuant to the Bradley Assignment to pay the overriding royalty interest.[9]   In reaching a conclusion as to the amount owed, the parties dispute the meaning of the term "well site" as defined in the TransAtlantic-Eastern Assignment and incorporated by referenced in the Bradley Assignment.

First, as to the Bradley Parties' Breach of Contract claim. The Court finds that there is no dispute that the Bradley Assignment was recorded in both Belmont and Monroe counties and

---

[9] The Bradley Parties specifically note interests in Gulfport's Clark and Starr Units pursuant to the Barker and Hothem Leases identified on Exhibit B to the TransAtlantic-Eastern Assignment. (Doc. 27-1, Defs.' Am. Counterclaim, Am. Third-Party Compl. and Crossclaim at ¶¶ 29–44).

is therefore valid. The Northwood Parties do not dispute this contention. (*See* Doc. 49, Pls.'

Mot. for Summ. J. at 32) ("[I]f the 1994 Bradley Assignment is construed as set forth below, the

Northwood Parties do not dispute that the 1994 Bradley Assignment applies to pertinent leases of

property located in Belmont and Monroe County."). And neither Gulfport nor Antero have filed

a response opposing Plaintiffs' Motion for Summary Judgment on this claim. The Bradley

Parties are therefore entitled to judgment on their breach of contract claim with respect to the

Bradley Override in Belmont and Monroe Counties. Gulfport and Antero are hereby ordered to

pay the Bradley Parties any and all monies due under the Bradley Override for those two counties.

The only point of contention with respect to the Bradley Override in the aforementioned

counties is the meaning of the term "well site." Plaintiffs argue that "the meaning of 'Well Sites'

under the TransAtlantic-Eastern Assignment will determine the extent of the 1994 Bradley

Assignment as applied to properties located in Belmont and Monroe County." (*Id.* at 32–33).

The TransAtlantic-Eastern Assignment provides in relevant part that the following interests were

transferred from TransAtlantic to Eastern:

> 1. All of Assignors' rights, titles and interests (including all working interests and overriding royalty interests) in and to a) the oil and gas wells described on Exhibit A-1 attached hereto (the "Wells"), b) all tangible personal property and fixtures located upon the Wells or Well Sites (as defined below), c) all sales or flow lines used to market oil and gas produced from the Wells, and d) all oil in the storage tanks connected to any of the Wells.
>
> 2. All of Assignors' rights, titles and interests (including all working interests and overriding royalty interests) in and to the portions of the oil and gas leases described on Exhibit B attached hereto (the "Leases") as are included within the well sites (the "Well Sites") designated on the survey well plats for each of the Wells, which are attached hereto as Exhibit B-1;
>
> 3. An undivided 50% of the working interests and, in addition, all Assignors' overriding royalty interests, in and to the portions of the Leases not included within the Well Sites, subject to the exclusion described in Paragraph 6 hereof;

...

> 6. It is specifically agreed that Assignee is receiving no interest in, and there is specifically excluded from this conveyance, the oil and gas wells described on Exhibit A-2 attached hereto (the "Retained Wells"), and those portions of the Leases as are both a) included within the well sites designated on the survey well plats which are attached hereto as Exhibit B-2 (the "Retained Well Sites") and b) limited to the geologic formation(s) into which the Reserved Wells were completed for production.

(Doc. 49-1, TransAtlantic-Eastern Assignment).

Plaintiffs argue that the term "Well Sites" refers to the existing well bore or the physical location of the Wells.   (Doc. 49 at 35-36).   Plaintiffs reference the survey plats attached as exhibits to the TransAtlantic Eastern Assignment in support of their argument.   (Doc. 48-4). Essentially, Plaintiffs ask this Court to find that the term "Well Site" is synonymous with the definition of a well.

Defendants counter that each word in a contract has a separate meaning and the fact that the terms "Well Sites" and "Wells" are separately defined in the Assignment indicates that the terms have distinct meanings.   Defendants contend:

> The "Well Sites" do not simply refer to the "Wells" or the location of the "Wells"; instead, they refer to the "portions of the oil and gas leases . . . as are included within the well sites designated on the survey well plats for each of the Wells . . . attached as Exhibit B-1." Doc. 48-4. These portions of leases are consistently shown on the survey well plats by a surveyed area indicating a precise number of acres. Also, in the overwhelming majority of survey well plats, the portions of the leases are precisely and clearly shown adjacent to the position description of the Well handwritten on the survey well plats. An example of the position description of the Well and amount of acreage in the "Well Site" is shown below. The Well is located 850 feet from the North Line (NL) and 290 feet from the West Line (WL) of the South East Quarter (SE 1/4) of Section 7 with 20 AC (acres) included in the Well Site.

(Doc. 54, Defs.' Memo. in Opp. at 31).

34

Both parties have submitted extrinsic evidence such as an expert report and affidavits in support of their respective positions. However, the Court need not consider extrinsic evidence unless it finds the language of the contract ambiguous. It is well-settled law in Ohio that:

> Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions.

*Shifrin v. Forest City Ents., Inc*., 64 Ohio St.3d 635, 597 N.E.2d 499 (1992), syllabus.

The TransAtlantic-Eastern Assignment does include both the terms "Wells" and "Well Sites" and the Court agrees with Defendants that the two terms do have different meanings in the Assignment. The Wells are specifically described on Exhibit A-1 and the Well Sites are clearly defined in the Assignment as "designated on the survey well plats for each of the Wells, which are attached hereto as Exhibit B-1." (Doc. 49-1). The Well Sites are not just the Wells or location of the Wells but are the portions of the Leases shown on the survey well plats indicating a precise number of acres.

The Court agrees that it defies logic to find that Well and Well Site have the same meaning in the aforementioned Assignment. In eight of the 108 survey well plats there is a notation of "well site" at the location of the well. Plaintiffs ask the Court to rely on this designation by the surveyor to find that this was the intended meaning of the term well site in the Assignment. The Northwood Parties note that in some of the survey plats, the same circle is also labeled "well loc." meaning well location. However, notations on the surveys are not the terms of the Assignment and therefore cannot change the meaning of the term "Well Site" as defined in the Assignment.

The plain language of the TransAtlantic Eastern Assignment defines "Well Sites" and that is the definition that must be applied to the facts of this case. The portions of the Leases

designated on the survey well plats are noted consistently on all the survey well plats. Therefore, the Bradley Parties are entitled to "an overriding royalty interest of five percent (5%) of 8/8ths (the "ORRI") in and to all of the acreage subject the Leases and to all oil and gas produced from, or allocated to, said Leases" subject to some exceptions. (Doc. 49-3, Bradley Assignment). Assuming the first well drilled by Gulfport and/or Antero was not drilled in the same geological formation as the existing wells, then any new wells that have been drilled on the acreage subject to the Leases as defined by the TransAtlantic-Eastern Assignment in Belmont and Monroe Counties will have generated an overriding royalty interest payment due to the Bradley Parties. The Bradley Override should therefore be calculated at 5% for those portions of the Leases that are depicted within the surveyed boundaries on the survey plats comprising Exhibit B-1 to the TransAtlantic-Eastern Assignment. Accordingly, the Bradley Parties are entitled to summary judgment on their breach of contract claims regarding their rights under the Bradley Assignment in Belmont and Monroe Counties.

## IV.    CONCLUSION

Based on the aforementioned reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendants' Motion for Partial Summary Judgment. Defendants are entitled to judgment in their favor on Plaintiffs' slander of title claim and the breach of contract claim. All other claims, counterclaims and cross-claims remain pending.

The parties are instructed to contact Magistrate Judge Deavers' chambers to schedule a mediation conference with retired Magistrate Judge Mark Abel who previously mediated this case. The mediation conference should take place as soon as possible, but no later than June 15, 2019.

Should the mediation be unsuccessful, the parties shall contact Magistrate Judge Deavers' chambers to schedule a status conference to establish a final case management schedule.

The Clerk shall remove Documents 48 and 49 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**