## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

RALPH W. TALMAGE, as
TRUSTEE OF RALPH W.
TALMAGE TRUST, *et al.*,

    **Plaintiffs,**

    v.

                   :

JACQUELINE M. BRADLEY, *et al.*,
                             **Case No. 2:17-cv-544**
                             **Judge Sarah D. Morrison**

    **Defendants/Third-Party**      **Magistrate Judge Elizabeth A.**
    **Plaintiffs,**                   **Preston Deavers**
                     :

    v.

NORTHWOOD ENERGY
CORPORATION,

    **Third-Party Defendant.**

## <u>BENCH OPINION AND ORDER OF FINAL JUDGMENT</u>

Ralph W. Talmage (as Trustee of the Ralph W. Talmage Trust) and David E. Haid (as Trustee of the David E. Haid Trust) first brought suit against Jacqueline M. Bradley and the Estate of Ralph L. Bradley (together, the "Bradley Parties"), Gulfport Energy Corporation, and Antero Resources Corporation on June 22, 2017.[1] (ECF No. 1.) The Bradley Parties subsequently filed Counterclaims against Messrs.

---

[1] The Complaint also asserted claims against John Does 1–6. The Doe Defendants were never identified or served, nor were they dismissed from the action. Messrs. Talmage and Haid clarified at the pretrial conference that they had abandoned all claims against the Doe Defendants. Messrs. Talmage and Haid also notified the Court that their breach of contract claim against Gulfport (Count V of the Complaint) was discharged through bankruptcy. Accordingly, those parties and claims are **DISMISSED** and will not be discussed in this opinion.

Talmage and Haid, a Third-Party Complaint joining Third-Party Defendant Northwood Energy Corporation (together with Messrs. Talmage and Haid, the "Northwood Parties"), and Crossclaims against Gulfport and Antero. (ECF No. 33.)

On March 26, 2019, this Court denied the Northwood Parties' motion for partial summary judgment and granted in part and denied in part the Bradley Parties'. (Summ. J. Order, ECF No. 69. Reported as *Talmage v. Bradley*, 377 F. Supp. 3d 799 (S.D. Ohio 2019) (Smith, J.).) The case proceeded to a bench trial in September 2021 on liability for all remaining claims, with damages to be considered at a later date. (*See* ECF Nos. 174, 175.) Post-trial briefs have been submitted by Gulfport (ECF No. 181), the Northwood Parties (ECF Nos. 182, 185) and the Bradley Parties (ECF Nos. 183, 184). Upon review of such filings, and pursuant to Federal Rule of Civil Procedure 52(a), the Court now issues the following findings of fact and conclusions of law.

## I.     FINDINGS OF FACT[2]

### A.     The Parties

Messrs. Talmage and Haid own Northwood, an oil and gas producer. (Jt. Stip. ¶ 1, ECF No. 136.) They are also trustees of the revocable trusts bearing their respective names. (*Id.*, ¶¶ 2, 3.) Mrs. Bradley is the widow of Ralph Bradley and the executor of his estate. (*Id.*, ¶¶ 4–5.) Before his death, Mr. Bradley was an owner and

---

[2] The labels and headings included in this Bench Opinion and Order of Final Judgment are not controlling. *See Cordovan Assoc., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6th Cir. 1961) (citing *Bogardus v. Comm'r of Internal Revenue*, 302 U.S. 34 (1937)). To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

executive of Eastern States Oil & Gas, Inc., also an oil and gas producer. (*Id.*, ¶ 6.) Gulfport and Antero are in the same line of business. (*See id.*, ¶¶ 23–25.)

The story that brings these parties together spans nearly two dozen years, and stems from a mistake that went unnoticed for many of them.

### B. TransAtlantic assigned the Leases to Eastern in April 1994.

On April 21, 1994, a family of companies known as TransAtlantic assigned, in whole or in part, their right, title, and interest in certain oil and gas leases and related wells to Eastern (the "TransAtlantic-Eastern Assignment"). (*Id.*, ¶ 7. *See also* Exs. J-1–J-3.) The leases subject to the TransAtlantic-Eastern Assignment are identified on Exhibit B thereto (the "Leases"), which lists the lessor, lessee, field, section, township, and county for each. (*See, e.g.*, Ex. J-1, BRADLEY0000008–12.) The Leases cover land in Eastern Ohio, spanning Noble, Monroe, and Belmont Counties. (*Id. See also* Jt. Stip., ¶ 8.) The TransAtlantic-Eastern Assignment was recorded in all three of those counties. (Jt. Stip., ¶¶ 9–11. *See also* Ex. J-1–J-3.)

### C. Eastern intended to assign Mr. Bradley an overriding royalty interest in the Leases in December 1994.

Eastern subsequently assigned to Mr. Bradley an overriding royalty interest in certain new wells drilled onto land covered by the Leases (the "Bradley Override"):

> WHEREAS, [Eastern] ("Assignor"), acquired certain oil and gas properties, including certain oil and gas wells and certain oil and gas leases, pursuant to an Assignment and Bill of Sale dated April 21, 1994 and recorded in Volume 5, Page 947 of the Official Records of Monroe County, Ohio, and Volume 108, Page 278 of the Lease Records of Belmont County, Ohio, collectively called the "Assignment"[]. The oil and gas wells existing as of the date of the Assignment are more particularly described in Exhibit A-1 of the Assignment (the "Wells"),

3

and the oil and gas leases are more particularly described on Exhibit B of the Assignment (the "Leases"), which documents are incorporated herein by reference;

WHEREAS, Assignor desires to assign an overriding royalty interest to Ralph L. Bradley, subject to the terms and conditions set out hereinafter.

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, [Eastern] hereby does GRANT, BARGAIN, SELL, ASSIGN, TRANSFER AND CONVEY, subject to all of the provisions set out hereinafter, without warranty of title, either express or implied, unto RALPH L. BRADLEY ("Assignee") an overriding royalty interest of five percent (5%) of 8/8ths (the "ORRI") in and to all of the acreage subject the Leases and in and to all oil and gas produced from, or allocated to, said Leases, SAVE AND EXCEPT the following:

1. It is expressly understood that all of the producing Wells conveyed by the Assignment – which is all of the Wells save and except the non-producing Baker #2 Well, Well ID WOM 12356 – are expressly excepted from this assignment of ORRI, it being the intention of the parties hereto that the ORRI provided for herein shall NOT apply to the producing wells acquired by Assignor under the Assignment, but shall apply to non-producing wells and future wells, subject to paragraph 2 below.

2. The ORRI shall NOT apply to the first well drilled by Assignor offsetting each of the producing Wells. By "offsetting", it is meant a well which is drilled to the same geologic formation as the subject Well.

3. In the event Assignor exercises the pooling rights (if any) contained in the Leases, the ORRI assigned herein shall be unitized and paid on a unitized basis.

4. In the event the leasehold estate of any of the Leases is less than 100%, the ORRI shall be proportionately reduced. In addition, in the event the working interest in the Leases assigned to Assignor by virtue of the Assignment is less than 100%, the ORRI shall be proportionately reduced. It is expressly understood, however, that any future assignments of working interest(s) by Assignor shall be made subject to the ORRI.

This assignment is made subject to all of the terms and the express and implied covenants and conditions of the Leases.

> EXECUTED this 19th day of December, 1994, and effective as of the date of first production of any well to which this overriding royalty interest applies.

(Exs. J4–J-5.) Although the face of the Bradley Override does not mention Noble County, Exhibit B includes Noble County leases. (*Id*.) Once executed, the Bradley Override was recorded in Belmont and Monroe Counties. (Jt. Stip., ¶¶ 13–14.) It was not recorded in Noble County. (*Id*., ¶ 15.)

The Bradley Override was drafted by Eastern's then-General Counsel, Barbara J. Bordelon. (*See id*. *See also* Ex. J-21, ¶ 2; Bordelon Dep., 68:17–25, ECF No. 171.) According to Ms. Bordelon, Eastern "always made assignments of overrides to [Mr. Bradley] on all the properties . . . [I]t was a standing policy by the time [she] got [to Eastern] to assign overrides to [Mr. Bradley] on all properties." (Bordelon Dep., 92:3–10.) She attributes the failure to reference Noble County on the face of the Bradley Override, and the subsequent failure to record the Bradley Override in Noble County, to "a mistake in drafting" and "a clerical error." (*Id*., 95:8–96:12.) Ms. Bordelon maintains, however, that the Bradley Override "should have been recorded in Noble" County. (*Id*., 95:17. *See also* Ex. J-21.)

### D. Eastern's interest in the Leases was assigned to NCL in May 2005.

Over the next decade, Eastern's interest in the Leases, as originally acquired from TransAtlantic, bounced among related corporate entities. First, on April 26, 2000, Eastern changed its name to Equitable Production – Eastern States, Inc. (Ex. J-58.) About one year later, Equitable Production – Eastern States, Inc. merged with and into Equitable Production Company. (Ex. J-59.)

5

Equitable then conveyed its interest in the Leases to NCL Appalachian Partners LP in a two-step transaction. First, via three instruments titled Assignment, Bill of Sale and Conveyance and dated May 17, 2005, Equitable assigned its interest in the Leases to "two newly-created, wholly owned subsidiaries," AB Production LLC and AB Production II LLC (the "Equitable-AB Assignment"). (Exs. J-6–J-8. *See also* ECF No. 183, 5.) Each instrument conveyed interests held in a single county—Noble, Belmont, or Monroe—and was recorded in that county. (Exs. J-6–J-8.) The Equitable-AB Assignment

> grant[s], bargain[s], sell[s], convey[s] and assign[s] unto AB [and AB II] all of Equitable's right, title and interest, to the extent of its interest . . . in and to the oil, gas and/or mineral leases, royalty interests and overriding royalty interests and deeds described on Exhibit A [thereto], together with all rights, title and interests in and to any other oil, gas and/or mineral leases, royalty interests and overriding royalty interests and deeds located in the counties of the State of Ohio described in Exhibit A[.]

(*Id.*) It also provides that AB and AB II

> accept the assignment and transfer of the Properties, [including the interests described above,] and expressly assume any and all covenants, agreements, duties, responsibilities, obligations and liabilities arising from and after [January 1, 2005,] with respect to or in connection with the Properties.

(*Id.*) Neither the Equitable-AB Assignment, nor any of its exhibits, discuss or identify the Bradley Override. (*Id.*)

To complete the transaction, AB and AB II merged with and into NCL on May 31, 2005. (Exs. J-60–J-61.)

### E. NCL assigned its interest in the Leases to Northwood in January 2006.

Six months after NCL acquired its interest in the Leases, it conveyed them to Northwood in three instruments titled Assignment, Bill of Sale and Conveyance, each effective as of January 1, 2006 (together, the "NCL-Northwood Assignment"). (Exs. J9–J-11.) Again, each instrument conveyed interests held in a single county— Noble, Belmont, or Monroe—and each was recorded in that county. (*Id.*) The NCL-Northwood Assignment first recounts the history of NCL's purchase of the interest from Equitable, via AB and AB II, and proceeds to assign to Northwood "all of the properties, rights, titles and interests which were formerly owned by [Equitable] in the counties of Noble, Monroe and Belmont[.]" (*Id.*) The assignment was made subject to the following:

(A)   a proportionate part of the covenants, provisions, royalties and terms of the Leases;

(B)   the terms and conditions of all existing orders, rules and regulations and ordinances of federal, state and other governmental agencies having jurisdiction;

(C)   any valid and subsisting oil, casinghead gas and gas sales, purchase, exchange and processing contracts and agreements, insofar and only insofar as the same are appurtenant or relate to the Leases;

(D)   a proportionate part of all overriding royalty interests, restrictions, exceptions, reservations, burdens, encumbrances, conditions, limitations, interests, instruments, agreements and other matters, if any, which are of record in the state and county above named and which burden or affect the properties, rights or interests herein assigned;

(E)   the terms and conditions contained in the joint operating agreement or agreements, if any, which covers and affects any of the Leases and the lands covered thereby and any other existing

or executory farmout agreements, farmin agreements, letter agreements, contracts or other agreements which relate to any of the properties, lands or interests described in Exhibit A, if any; and

(F) all of such orders, rules, regulations, ordinances, instruments, burdens, encumbrances, reservations and terms and conditions listed in clauses (A) through (E) of this Assignment, to the extent the same are valid and enforceable and apply to the lands and interests described above are referred to in this Assignment as "Existing Burdens;" and the properties specified in clauses (1) and (2) of this Assignment, subject to the Existing Burdens, are referred to in this Assignment as the "Subject Interests."

(*Id.*) Neither the NCL-Northwood Assignment, nor any of its exhibits, discuss or identify the Bradley Override. (*Id.*)

Under the terms of the TransAtlantic-Eastern Assignment, TransAtlantic had retained a portion of the working interest in undeveloped acreage covered by the Leases. (*See* Exs. J-1–J-3, ¶ 3.) Simultaneous with its acquisition from NCL, Northwood acquired TransAtlantic's outstanding interest. (*See* Exs. J-12–J-14; Jt. Stip., ¶ 19; Tr. Vol. I, 182:3–5.) The "TransAtlantic-Northwood Assignment" was recorded in Noble, Belmont, and Monroe Counties. (Jt. Stip., ¶ 20.)

### F. Northwood assigned the Talmage Trust and the Haid Trust an overriding royalty interest in the Leases in December 2011.

On December 22, 2011, Northwood assigned to the Talmage Trust and the Haid Trust overriding royalty interests in production from "deep wells" on land covering Lease acreage (the "Talmage/Haid Override"). (*Id.*, ¶ 21.) The Talmage/Haid Override provides:

This assignment . . . is made by [Northwood ("Assignor")] for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. Assignor hereby grants, assigns, transfers, conveys and

sets over unto the Assignees [(the Talmage Trust and the Haid Trust)], an overriding royalty interest (the "Overriding Royalty Interests") carved from the oil and gas leases described on Exhibit A (the "Leases"), limited to and only insofar as such relates to or includes the Geologic Formation (as defined below), and subject to the terms and conditions provided below.

1. <u>Assignment</u>. The Overriding Royalty Interests are payable out of all oil, gas and associated hydrocarbons produced, saved and sold, on a lease by lease basis, from the Leases and shall be equal, in the aggregate for each Lease, to the difference between (i) eighteen percent (18%) and (ii) the sum of all burdens existing on a Lease including, without limitation, royalty, overriding royalty, net profits interests, and other similar interests of record affecting or burdening Assignor's interest in any given lease conveyed hereby as of the execution date hereof (the "Effective Date"). Should the burdens of record affecting or burdening the Assignor's interest in such lease being conveyed as of the Effective Date equal or exceed eighteen percent (18.00%), there shall be no overriding royalty interest conveyed.

   . . .

   As used in this Assignment, the term "Geologic Formation" shall mean the stratigraphic equivalent from the subsurface depths beginning 100 feet below the top of the Queenston Shale Formation down to and including 100 feet below the top of the Trenton limestone and being further defined as from 4,372' to 5,786' as picked in the electric log for the Hunter #1 (API #3403126882) located in Section 16, T6N, R5W, White Eyes Township, Coshocton County, Ohio.

2. <u>Special Title Warranty</u>. The Leases are conveyed with limited warranty of title by, through and under Assignor, but not otherwise.

3. <u>Successors and Assigns</u>. This assignment shall be binding upon and shall inure to the benefit of Assignor and Assignees and their respective successors and assigns.

Executed this 27 day of December 2011 by the duly authorized representative of Assignor.

(Ex. J-18.) The Talmage/Haid Override was recorded in Noble, Belmont, and Monroe Counties. (Jt. Stip., ¶ 22.) Neither the Talmage/Haid Override, nor its exhibits, discuss or identify the Bradley Override. (Ex. J-18.)

### G. Gulfport and Antero subsequently acquired rights in the Leases and expanded oil and gas production on the subject acreage.

On or about June 20, 2012, Northwood assigned "deep rights" in certain of the Leases to Gulfport. (Jt. Stip., ¶ 23; Ex. J-19.) In March 2016, Gulfport assigned certain of those rights to Antero. (Jt. Stip., ¶ 24; Ex. J-20.) Antero has since formed drilling units for oil and gas exploration on Lease acreage (including in Noble County) and currently operates oil and gas wells in those units. (Jt. Stip., ¶ 25.)

### H. The parties dispute the validity of the Bradley Override in Noble County.

In early 2016, Mr. and Mrs. Bradley updated their home address with various county recorders' offices. (Ex. P-1, ¶ 3.) In doing so, the Bradleys "discovered for the first time that the Bradley Override was not on file in Noble County." (*Id.*, ¶ 4.) On the advice of counsel, Mr. Bradley enlisted Ms. Bordelon and David A. Dresner, another former Eastern executive, to file Affidavits of Facts Relating to Title in Noble County. (Tr. Vol. II, 289:7–9. *See also* Exs. J-21, J-22.) Ms. Bordelon's Affidavit, dated June 22, 2016, states:

> On or about April 21, 1994, Eastern States acquired oil and gas interests in Noble County, Ohio, including interests in oil and gas wells and leases listed on Exhibit B to an Assignment and Bill of Sale recorded in Noble County, Ohio, at Volume 12, Page 457, of the Noble County Recorder's Office (the "Eastern States Leases").
>
> On or about December 19, 1994, Eastern States assigned an overriding royalty interest in the Eastern States Leases, as more particularly

described therein, to Ralph L. Bradley evidenced by an Assignment of Overriding Royalty Interest, a copy of which is attached hereto as Exhibit A, and incorporated herein by reference. I prepared said assignment in my capacity as General Counsel of Eastern States.

The assignment of the overriding royalty interest to Ralph L. Bradley was made pursuant to an agreement between him and Eastern States covering the terms under which such an assignment would be made to him.

Eastern States undertook the recording of the Assignment of Overriding Royalty Interest in each county in which the overriding royalty applied, being Monroe, Belmont and Noble Counties.

Nevertheless, the Assignment of Overriding Royalty Interest, shown on Exhibit A, appears to have only been recorded in Monroe County, Ohio (Official Records Volume 10, Page 533), and in Belmont County, Ohio (Official Records Volume 108, Page 501).

It is my belief that the Overriding Royalty Interest may not have been filed of record in Noble County, Ohio, due to administrative error or oversight.

(Ex. J-21.) Mr. Dresner's Affidavit, dated August 3, 2016, similarly states:

On or about April 21, 1994, Eastern States acquired oil and gas interests in Noble County, Ohio, including interests in oil and gas wells and leases listed on Exhibit B to an Assignment and Bill of Sale recorded in Noble County, Ohio, at Volume 12, Page 457, of the Noble County Recorder's Office (the "Eastern States Leases").

On or about December 19, 1994, Eastern States assigned an overriding royalty interest in the Eastern States Leases, as more particularly described therein, to Ralph L. Bradley evidenced by an Assignment of Overriding Royalty Interest, a copy of which is attached hereto as Exhibit A, and incorporated herein by reference. I executed said assignment in my capacity as President and Chief Operating Officer of Eastern States.

The assignment of the overriding royalty interest to Ralph L. Bradley was made pursuant to an agreement between him and Eastern States covering the terms under which such an assignment would be made to him, and it was a standard practice for the Company to record such assignment in each county in which the applicable leases were located.

(Ex. J-22.)

11

On August 31, 2016, Antero advised Northwood that the Bradley Override was operating to reduce royalties paid pursuant to the Talmage/Haid Override. (Ex. D-5.) On February 14, 2017, Northwood advised Antero that Mr. Talmage "disagree[d] with the reduction in the override pertaining to the acreage located in Noble County." (Ex. J-50.) Antero then placed all subject royalty payments in suspense pending resolution of the ownership dispute. (Jt. Stip., ¶¶ 25, 27.)

On March 20, 2017, just three days before he passed away, Mr. Bradley assigned the interests conveyed in the Bradley Override to Mrs. Bradley (the "Bradley-Bradley Assignment"). (*Id.*, ¶¶ 32, 34. *See also* Ex. D-1.) The Bradley-Bradley Assignment was recorded in Noble County the following month. (*Id.*, ¶ 33.)

## II.  PROCEDURAL POSTURE

The parties dispute whether the Bradley Override is valid and enforceable as to the Noble County Leases, and whether the Northwood Parties or the Bradley Parties acted tortiously or in breach of contractual obligations as to the other's purported rights.[3] Before answering those questions, the Court finds it appropriate to review the procedural history of the case, including the Summary Judgment Order.

The Trusts' Complaint seeks: declaratory judgment that the Northwood Parties' current and former interests in Noble County (including the Talmage/Haid Override) are not subject to the Bradley Override (Count I); that title be quieted as

---

[3] Neither Antero nor Gulfport take a position on the validity and enforceability of the Bradley Override in Noble County and agree to be bound by the Court's judgment. (Jt. Stip., ¶¶ 28–30.)

to the Noble County interests, and that the Bradley Override be found invalid as to the Northwood Parties' Noble County interests (Count II); and that the Bradley Parties be found liable for slander of title (Count III) and tortious interference (Count IV). (ECF No. 1.)

The Bradley Parties' Amended Counterclaim, Third-Party Complaint, and Crossclaim seeks: declaratory judgment that the Northwood Parties' current and former interests in Noble County are subject to the Bradley Override (Count I); that title be quieted in favor of the Bradley Override as to the Noble County interests (Count II); that Gulfport and the Northwood Parties be found liable for breach of contract (Count III); that Gulfport and the Northwood Parties be found liable for conversion (Count IV); and that the Northwood Parties be found liable for unjust enrichment (Count V) and tortious interference (Count VI). (ECF No. 33.)

On July 27, 2018, the Northwood Parties and the Bradley Parties each filed motions for partial summary judgment. (ECF Nos. 48, 49.) On March 26, 2019, this Court ruled on those motions. (Summ. J. Order.) The Summary Judgment Order established as a matter of law that "Ohio Revised Code § 5301.09 [(requiring interests in oil and gas leases to be recorded)] is applicable to [assignments of] overriding royalty interests[.]" (*Id.*, 13.) But "the Court decline[d] to invalidate the Bradley Override on the Noble County Leases based on the failure to record in Noble County[,]" in favor of receiving further evidence and argument on the Northwood Parties' knowledge of the Bradley Override at the time it entered into

the NCL-Northwood Assignment. (*Id.*, 23, 30.) The Court nonetheless granted the

Bradley Parties' motion to the extent that:

- The Northwood Parties did not present sufficient evidence for a reasonable jury to find that the Bradley Parties committed slander of title (*id.*, 32); and

- The Bradley Override was valid and enforceable as to interests in Belmont and Monroe Counties (*id.*, 36).

All remaining issues and claims were reserved for trial. (*Id.*)

## III.   CONCLUSIONS OF LAW[4]

### A.   The Bradley Override is not valid in Noble County.

As to the Noble County interests, both the Trusts and the Bradley Parties

seek declaratory judgment and an order quieting title in favor of their respective

override. The Court first reiterates the Summary Judgment Order's conclusion that

Ohio's specific recording statute applies to assignments of overriding royalty

interests.[5] (Summ. J. Order, 13.) That statute provides:

---

[4] Federal courts sitting in diversity apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The forum state's choice-of-law rules determine which state's substantive law will apply. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). Where, as here, "'neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.'" *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (quoting *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)). Consequently, the Court applies the substantive law of Ohio.

[5] Because the specific recording statute (Ohio Rev. Code § 5301.09) applies, the general recording statute (Ohio Rev. Code § 5301.25) does not. *See Nw. Ohio Nat. Gas Co. v. City of Tiffin*, 54 N.E. 77, 82 (Ohio 1899) ("It is a settled rule of construction that special statutory provisions for particular cases operate as exceptions to general provisions which might otherwise include the particular cases, and such cases are governed by the special provisions.").

> In recognition that such leases and licenses create an interest in real estate, all leases, licenses, and assignments thereof, or of any interest therein, given or made concerning lands or tenements in this state, by which any right is granted to operate or to sink or drill wells thereon for natural gas and petroleum or either, or pertaining thereto, shall be filed for record and recorded in such lease record without delay, and shall not be removed until recorded. . . .
>
> No such lease or license is valid until it is filed for record, except as between the parties thereto, unless the person claiming thereunder is in actual and open possession.

Ohio Rev. Code § 5301.09.

The Bradley Override was not filed for record in Noble county. Accordingly, it is not valid in Noble County unless one of the statutory exceptions—"actual and open possession" or enforcement "between the parties thereto"—applies. The "actual and open possession" exception does not apply. The question becomes whether, as to the Bradley Override, Northwood may be considered a "party thereto." It cannot.

The Bradley Parties argue that "[b]ecause Northwood assumed NCL's contractual obligations, and because NCL stood in the shoes of Eastern, then Northwood is bound as a party to the Bradley [Override.]"[6] (ECF No. 183, 33.) It is

---

[6] The Court considered this argument at summary judgment, but withheld a decision pending presentation of evidence on "whether the Northwood Parties were aware of the Bradley [Override]" at the time of the NCL-Northwood Assignment. (Summ. J. Order, 23.) If the evidence showed that the Northwood Parties were aware of the Bradley Override, Northwood *might* be considered to have assumed Eastern's contractual obligation to Mr. Bradley. (*See id.*, 14.) Though the Summary Judgment Order is not a model of clarity on this point, it is perhaps reflective of the inevitably blurred line between contractual interests and property interests in the realm of mineral estates. *See Chesapeake Exploration, L.L.C. v. Buell*, 45 N.E.3d 185, 193 (Ohio 2015) ("[O]il and gas leases are unique, as they seemingly straddle the line between property and contract[.]") (internal citation and quotation omitted). After carefully considering all evidence and argument now before it, the Court is not persuaded that the Northwood Parties were aware of the Bradley Override's application to Noble County at the time of the NCL-Northwood Assignment—or

true that, under Ohio law, an assignee to a contract "stands in the shoes" of the assignor. *See, e.g.*, *Cameron v. Hess Corp.*, 974 F. Supp. 2d 1042, 1055–56, (S.D. Ohio 2013) (Marbley, J.) (quoting *Inter Ins. Exch. of Chi. Motor Club v. Wagstaff*, 59 N.E.2d 373, 375 (Ohio 1945)). But, under the plain terms of the contracts in evidence, Eastern's obligations under the Bradley Override were not assigned to or assumed by Northwood. *See Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*, 507 F. Supp. 3d 940, 946 (S.D. Ohio 2020) (Cole, J.) (explaining that, under Ohio law, courts apply clear and unambiguous contract language as written). The contract containing the obligations the Bradley Parties seek to impose on Northwood is the Bradley Override. One could debate whether the Equitable-AB Assignment successfully saddled AB (and, subsequently, NCL) with the Bradley Override. But there can be no reasonable debate that the plain language of the NCL-Northwood Assignment conveyed rights subject only to those overriding royalty interests that were properly recorded. For these reasons, Northwood has no contractual obligation under the Bradley Override and may not be considered a party thereto. The Bradley Override is, accordingly, unenforceable in Noble County.

---

that it would have mattered. *See City of Tiffin*, 54 N.E. at 82, syllabus ¶ 1 (holding that an instrument subject to the specific recording statute "is without any effect" unless recorded, even if the subsequent interest holder took with notice of the instrument).

## B.    Neither the Bradley Parties nor the Northwood Parties committed tortious interference.

The Northwood and Bradley Parties each allege that the other tortiously interfered with their business relationships and contracts. In *Marshall v. Belmont Cty. Bd. of Comm'rs*, this Court summarized Ohio law on tortious interference:

> "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). To recover on a claim for tortious interference with a business relationship, a plaintiff must establish: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015). "In contrast, the elements of tortious interference with contract are '(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'" *Id.* (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). With respect to either claim, "the plaintiff must show that the interference was without justification or privilege." *Casciani v. Critchell*, No. C–140338, 2015 WL 1227849, at *6 (Ohio Ct. App. Mar. 18, 2015).

110 F. Supp. 3d 780, 804 (S.D. Ohio 2015) (Graham, J.), *aff'd*, 634 F. App'x 574 (6th Cir. 2016).

"[E]stablishment of . . . lack of justification[] requires proof that the defendant's interference with another's contract was improper." *Fred Siegel Co.*, 707 N.E.2d at 858. In determining whether interfering conduct is "improper," Ohio courts consider the following factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in

17

protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 860 (adopting Restatement (Second) of Torts § 767 (1979)). Here, consideration of those factors weighs against a finding that any party's conduct was improper. Instead, the Court is persuaded by the evidence presented at trial that both the Northwood Parties and the Bradley Parties acted with a good faith belief that their rightful interests were being ignored or impeded.

The Trusts argue for the opposite conclusion, emphasizing that the Bradley Parties filed the Bordelon and Dresner affidavits, and contacted Gulfport and Antero, knowing that those actions would "inevitably lead to the suspension of" the royalty payments. (ECF No. 185, 48.) They lament that the Bradley Parties' conduct "put[] the Trusts between a rock and hard place: either initiate costly litigation to vindicate their rights or sit back and not be paid on their overriding royalty interests[.]" (*Id.*, 49.) But this does not even hint at impropriety. Indeed, the Bradley Parties could have made[7] the same argument. A legitimate dispute arose and needed to be resolved before the royalty amounts could be paid—to anyone. *Cf.* Restatement (Second) of Torts § 767 cmt. c (noting that the threat of litigation may be wrongful conduct, but only where "the actor has no belief in the merit of the litigation" or does so "intending only to harass . . . and not to bring his claim to definitive adjudication").

---

[7] The Bradley Parties make no mention of their own tortious interference claim in post-trial briefing. (*See* ECF No. 183, 34; ECF No. 184, 15–16.)

### C. The Northwood Parties did not commit conversion and were not unjustly enriched.

Finally, the Bradley Parties allege that the Northwood Parties committed conversion and were unjustly enriched. Frustratingly, the Bradley Parties do not so much as mention these claims in their post-trial briefing. There is neither argument for a finding of liability, nor is there an indication of waiver or voluntary dismissal. Nevertheless, the evidence does not bear these claims out.

Under Ohio law, "[c]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 551 N.E.2d 172, 175 (Ohio 1990). "The elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Lee v. Ohio Educ. Assoc.*, 951 F.3d 386, 393 (6th Cir. 2020) (quoting *Dice v. White Family Cos.*, 878 N.E.2d 1105, 1009 (Ohio 2007)).

"Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another[.]'" *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hummel v. Hummel*, 14 N.E.2d 923, 927 (Ohio 1938)). "To prevail on a claim of unjust enrichment, a plaintiff must show: '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment[.]'" *M.S. by Slyman v. Toth*, 97

19

N.E.2d 1206, 1215 (Ohio Ct. App. 2017) (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)).

As already discussed, there is no indication or evidence that any party in this action engaged in wrongful or unjust conduct. The suspension of royalty payments was caused by two parties' good faith dispute over the proper ownership of those monies.

### D. Calculation of Damages

At the final pretrial conference, the parties moved for bifurcation of the case such that the Court considers only liability. (*See also* Jt. Stip., ¶ 31.) The parties represented that damages will be separately determined by stipulation, based on the Court's determination of ownership or, if necessary, by the Court at a later date. Accordingly, the Court will not engage in a calculation of damages here.

## IV. CONCLUSION

For the reasons set forth above, Court enters **JUDGMENT** as follows:

- For the Northwood Parties as to Counts I and II of the Complaint and as to all claims brought against them through the Amended Counterclaim, Third-Party Complaint and Crossclaim. The Northwood Parties' prayers for declaratory relief are **GRANTED**. Accordingly, the Court **DECREES** that the Bradley Override is not enforceable in Noble County.

- For the Bradley Parties as to Count IV of the Complaint. The Bradley Parties' prayers for declaratory relief are **DENIED**.

Finally, the parties are **ORDERED** to file a joint written status report **within thirty days** of the date of this Bench Opinion and Order of Final Judgment detailing the status of discussions on damages, whether it is anticipated that further proceedings will be necessary, and to whom funds currently held in deposit with the Court should be released and in what amounts.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**